UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 02-60967-CIV-ZLOCH

STEVEN LERMAN, JAMES
TOWNSEND, STEVE HOLT, DAVID
ECKLUND, JAMES GAUGHEN,
TIMOTHY FALK, FRANK DEL RIO,
FRED ROSS, DAVID NICKERSON,
STEPHEN LITTLEFIELD,
JIM WIGAND, SAM WERNICK,
STEPHEN MEDLEY, and LAWRENCE
LOHSEN,

      Plaintiffs,

vs.                                          **O R D E R**

CITY OF FORT LAUDERDALE,
FLORIDA, and CITY OF FORT
LAUDERDALE POLICE OFFICERS' &
FIREFIGHTERS' RETIREMENT BOARD,

      Defendants.
_____/

    THIS MATTER is before the Court upon Defendant City of Fort
Lauderdale's Motion For Summary Judgment (DE 173) and Plaintiffs'
Renewed Cross Motion For Partial Summary Judgment As To Liability
(DE 181).[1]  The Court has carefully reviewed said Motions and the
entire court file and is otherwise fully advised in the premises.

## I.  Background

    Plaintiffs, current and former police officers employed by
Defendant the City of Fort Lauderdale, initiated the above-styled

_____

    [1]Defendant City of Fort Lauderdale Police Officers' &
Firefighters' Retirement Board previously advised the Court that it
entered into a stipulation with Plaintiffs in which it conceded the
Court's jurisdiction and agreed to "comply with any relief that may
be ordered by the Court."  See DE 91.  Therefore, this Order shall
bind said Defendant in accordance with the stipulation.

cause with the filing of their Complaint (DE 1, Ex. A) in the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida. Therein, Plaintiffs alleged claims under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 et seq. (2006) (hereinafter "ADEA"), and the Florida Civil Rights Act of 1992, Florida Statutes § 760.10 (2008). The original Complaint stated claims against Defendant the City of Fort Lauderdale, Florida (hereinafter the "City") and the Fraternal Order of Police Lodge 31 (hereinafter "FOP"), which is the bargaining agent for the City of Fort Lauderdale Police Department (hereinafter "FLPD"). See DE 1, Ex. A, ¶ 103. Subsequently, Plaintiffs filed an Amended Complaint (DE 15) and a Second Amended Complaint (DE 26) (hereinafter "Complaint"), which stated an additional claim for Declaratory and Injunctive Relief against an added Defendant the City of Fort Lauderdale Police Officers' & Firefighters' Retirement Board (hereinafter the "Retirement Board"). Plaintiffs and FOP subsequently filed a Joint Stipulation For Voluntary Dismissal With Prejudice As To Defendant FOP (DE 40), and an Order dismissing FOP was entered by United States District Judge William P. Dimitrouleas.[2] See DE 48.

Plaintiffs' claims concern an early retirement incentive program the City implemented following collective bargaining

_____

[2] Judge Dimitrouleas subsequently entered a Notice Of Recusal, and the above-styled cause was reassigned to the undersigned. See DE 71.

negotiations between it and FOP.  Prior to implementing the program at issue, police officers were eligible for "normal retirement" after having reached 20 years of service and 47 years of age. Effective October 1, 1997, officers were eligible for retirement after 20 years of service regardless of age.  Once an officer retired, the officer would cease employment and begin collecting a pension.[3]  DE 66, ¶ 2.  Under the pension plan, the amount an officer collects under normal retirement is a function of the officer's years of service multiplied by an accrual rate, and that amount is then multiplied by the monthly average of the officer's pensionable salary from the two highest years of service.  DE 51, Ex. 16, ¶ 4.

The accrual rate is a recurring topic of negotiations between the City and FOP, and often varies from one collectively bargained agreement to the next.  For example, prior to October 1, 1997, each officer's pension amount accrued at 3% per year for the first 20 years of service, and at 2% each year after that up to a maximum accrual rate of 75%.  DE 66, ¶ 3, n. 2.  Under the next agreement, effective from October 1, 1997, until September 30, 2000, (hereinafter the "1997 Agreement"), each officer's pension amount accrued at a rate of 3% each year, up to a maximum accrual rate of 81%.  DE 66, ¶ 3.  Under the 1997 Agreement, an officer needed to complete 27 years of service in order to achieve the maximum

_____

[3] All facts recited are undisputed unless otherwise indicated.

3

accrual rate of 81%. In the agreement that followed, effective beginning October 1, 2000 (hereinafter the "2000 Agreement"), the City and FOP contracted for an accrual rate of 3.38% for each year of service, maintaining a maximum accrual rate of 81%. Id. at ¶ 4. Because of the increased accrual rate, an officer was able to reach the maximum accrual rate with only 24 years of service. Id. Additionally, if an officer had already reached the maximum accrual rate of 81% at the time of the 2000 Agreement, said Agreement allowed an additional accrual rate increase of up to 91.26%. Id. This benefit effected half of Plaintiffs in the above-styled cause, namely David Ecklund (90.4%), Timothy Falk (83.3%), James Gaughen (91.26%), Stephen Medley (84.3%), David Nickerson (85.1%), Sam Wernick (91.26%), and Jim Wigand (90.4%).

On October 15, 1996, as the result of negotiations with FOP, the City implemented the retirement plan at issue, namely the Deferred Retirement Option Program (hereinafter "DROP"). Set to become effective March 1, 1997, officers became eligible for DROP upon reaching 20 years of service and 47 years of age. DE 51, Ex. 15, ¶ 9. Upon becoming eligible, an officer remained eligible for DROP for 36 months. Id. If he or she elected to enter DROP, the officer submitted an irrevocable letter of resignation, and signed a document entitled "City Of Fort Lauderdale Deferred Retirement Option Program OWBPA Acknowledgment, Waiver And Release

4

Agreement."[4]  This election established the officer as retired in the sense that he or she no longer accrued additional years of service credit towards normal retirement.  Id. at ¶ 7.  However, the officer continued to work while receiving regular pay and benefits.  More importantly, the officer received the normal monthly pension payments he or she was eligible for, but such payments were made into a separate interest bearing account.  Id. At the end of the DROP period, the officer ceased employment, and, at the officer's discretion, received the amount in the aforementioned account in one lump sum, or by rolling it over into another tax-qualified retirement plan.  Id.

Although an officer was able to enter DROP any time during the 36 months following his or her first date of eligibility, the period of DROP participation was measured from the first date of eligibility.  DE 66, ¶ 7.  In other words, every month that an officer delayed entering DROP upon reaching eligibility was a month that the officer would not be eligible to participate in DROP.  If an officer waited 24 months after initial eligibility to enter DROP, he was only entitled to participate in DROP for 12 months.

In addition to modifying the terms of normal retirement, the 2000 Agreement also amended the terms of DROP, which became

---

[4] "OWBPA" refers to the Older Workers' Benefit Protection Act of 1990, 29 U.S.C. § 626(f)(1)(A)-(H) (2006) (hereinafter "OWBPA"), which amended various provisions of the ADEA.  OWBPA sets forth the requirements for a waiver of an employee's rights under the ADEA.

effective October 1, 2000.  First, the period of possible DROP participation was extended from 36 months to 60 months. Additionally, the age component of DROP was lowered from 47 years of age to 45 years of age.  DE 66, ¶ 9.  While the years of service component remained the same, officers were made eligible for DROP upon reaching 20 years of service regardless of age.  Id.  However, an officer did not begin to lose time from his DROP participation period upon simple attainment of 20 years of service.  Rather, the clock only began to run in a manner that shortened the DROP period upon the attainment of both 20 years of service and 45 years of age.  Id.

        With one exception discussed below, the 2000 Agreement's modifications to DROP did not change the initial eligibility dates of those officers who became eligible for the program prior to the amendment's effective date.  Said Agreement did, however, give DROP-eligible or DROP-enrolled officers the benefit of the 24 extra months and the increased multiplier that had been negotiated. Specifically, there were 12 officers who became DROP eligible prior to October 1, 2000, and elected to enter DROP.  DE 61, ¶ 16.  Those officers' DROP period was extended for an additional 24 months, DE 66, ¶ 10, and they were given the benefit of the negotiated increased multiplier percentage.  DE 61, ¶ 16.  Officers who became DROP eligible prior to the new effective date and opted not to enroll, and whose period of DROP eligibility had not closed, had 24 months added to whatever period of DROP eligibility remained.  DE

66, ¶ 10.   One exception to the rule that officers did not have their eligibility date changed was made for officers who had become DROP eligible prior to October 1, 2000, had elected not to enter DROP, and whose 36-month DROP eligibility period had passed.  These officers were given an additional opportunity to enroll in DROP for 17 months.  Id.

## II. Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate

> if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c); see also Eberhardt v. Waters, 901 F.2d 1578, 1580 (11th Cir. 1990).  The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)(quotation omitted).  Indeed,

> the moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial.  Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment.

Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991); Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991).

The moving party is entitled to "judgment as a matter of law" when the non-moving party fails to make a sufficient showing of an essential element of the case to which the non-moving party has the burden of proof. Celotex Corp., 477 U.S. at 322; Everett v. Napper, 833 F.2d 1507, 1510 (11th Cir. 1987). Further, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

III. Analysis

The City's Motion For Summary Judgment (DE 173) asserts numerous arguments and the Court will address them in the following order. First, the City argues that they are entitled to summary judgment because each of the Plaintiffs, with the exception of James Gaughen, knowingly and voluntarily signed a waiver releasing the City from liability under the exact claims Plaintiffs now assert. Second, the City argues that even if Plaintiffs are allowed to assert their claims despite signing a waiver, that DROP is not discriminatory, or alternatively is lawful under the ADEA's safe harbor provision for early retirement incentive programs. Third, the City argues that Plaintiffs' claims are time barred and that Plaintiffs failed to exhaust their administrative remedies. Finally, the City asserts sundry catch-all arguments addressing Plaintiffs' claims.

Plaintiffs filed a Cross Motion For Partial Summary Judgment As To Liability (DE 181).  In said Motion, Plaintiffs' argument is threefold: 1) DROP is discriminatory on its face, 2) the waiver is invalid because DROP is discriminatory and constitutes an ongoing violation of the ADEA, 3) DROP has a disparate impact on them.

The thrust of Plaintiffs' Complaint is that DROP violates the ADEA and the FCRA by discriminating against certain police officers solely on the basis of their age.

Plaintiffs argue that younger police officers have an opportunity to attain the maximum pension accrual rate of 81%, and then enter DROP for the full 60 months, thereby accruing the full benefit obtainable under DROP.  Plaintiffs argue they are faced with the following Hobson's choice: 1) enter DROP for a full term of 60 months, but with a reduced pension benefit accrual rate; or 2) work long enough to attain the maximum pension accrual rate of 81%, and then enrol in DROP if they still have a term of eligibility.  DE 67, p. 3.  Under either scenario, Plaintiffs argue, older officers stand to lose a significant amount of money. Plaintiffs further assert that because of the financial ramifications of not entering DROP when initially eligible, the supposed voluntariness of the program is illusory.  DE 61, ¶ 6. Regarding the 2000 Agreement, Plaintiffs argue that the City discriminated against them by not giving those who elected not to enter DROP prior to its implementation the opportunity to enter DROP for a full 60 months, while it gave those who did elect to

DROP the additional benefits provided for in the 2000 Agreement. Id. ¶ 13.

While Plaintiffs argue that the aforementioned facts establish that DROP was facially discriminatory, they further assert that other evidence exists to establish the City's discriminatory intent with regards to the plan. First, Plaintiffs point to the testimony of Detective Thomas Mangifesta, President of FOP who testified regarding the negotiations that resulted in the 2000 Agreement. Detective Mangifesta testified that although FOP proposed alternative DROP arrangements where age was not a factor, the City always insisted that age remain as a component. DE 60, Ex. A, p. 15. Additionally, Detective Mangifesta testified that when he asked the City's Employee Relations Director and chief negotiator M. Scott Melinski why the City so insisted, Melinski responded that "[the City] wanted senior officers to retire as soon as possible." Id. p. 16. Finally, two of the Plaintiffs were told by a member of the FOP that the City wanted to "get rid of" officers described as "old farts." DE 51, Ex. 4, p. 59; Ex. 10, p. 27. The City filed a Supplemental Concise Statement Of Undisputed Facts (DE 154) in which it asserts that it "intended DROP to serve as an early retirement incentive plan designed to encourage highly compensated police officers of long-standing seniority to retire earlier than they otherwise would if they so desired." DE 154, ¶ 1. The Court will begin by addressing the validity of the Waivers executed by all Plaintiffs except James Gaughen and then will proceed to

analyze whether DROP is discriminatory.

A.  Waiver of Plaintiffs' Claims

All Plaintiffs except James Gaughen, who never entered DROP, executed a document entitled "City Of Fort Lauderdale Deferred Retirement Option Program OWBPA Acknowledgment, Waiver And Release Agreement" (hereinafter the "Waiver") upon deciding to enter DROP.[5] Each waiver includes, in pertinent part, the following language:

> In consideration for allowing me to participate in and derive the benefits of the DROP, to which I acknowledge I would not otherwise be entitled and which I have freely and voluntarily elected, I hereby release and discharge the City of Fort Lauderdale, Florida . . . from all claims, liabilities, demands and causes of action, whether known or unknown, fixed or contingent, which I may have or claim to have against the City . . . as a result of my employment with the City; including but not limited to my election to participate in the DROP and to voluntarily resign and retire on the date specified in my letter of resignation.  I hereby promise not to file a lawsuit . . . .  This Waiver includes, but is not limited to, claims and liability under . . . employment discrimination laws such as the Age Discrimination in Employment Act of 1967 (29 U.S.C. 621, et seq.), . . . [and] the Florida Civil Rights Act of 1992 . . . .

Waiver, ¶ 1.  Thus, the terms of the Waiver, if valid, expressly bar Plaintiffs' claims in this case.

While waivers like the one quoted above are permissible, by its enactment of OWBPA, "Congress [has] imposed specific duties on employers who seek releases of certain claims created by [the ADEA]."  Oubre v. Entergy Operations, Inc., 522 U.S. 422, 427

---

[5]  See DE 51, Ex. 1, pp. 84-85; Ex. 2, Doc. 158; Ex. 3, Doc. 92; Ex. 5, Doc. 64; Ex. 6, Doc. 142; Ex. 7, Doc. 76; Ex. 8, Doc. 186; Ex. 9, Doc. 105; Ex. 10, Doc. 124; Ex. 11, Doc. 197; Ex. 12, Doc. 21; Ex. 13, Doc. 37; Ex. 14, Doc. 173.

(1998).  Under OWBPA, an employee may not waive his or her rights under the ADEA unless the waiver is given knowingly and voluntarily.  A waiver of those rights will not be considered knowing and voluntary unless at a minimum

> (A) the waiver is part of an agreement between the individual and the employer that is written in a manner calculated to be understood by such individual, or by the average individual eligible to participate;
>
> (B) the waiver specifically refers to rights or claims arising under this chapter;
>
> (C) the individual does not waive rights or claims that may arise after the date the waiver is executed;
>
> (D) the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual already is entitled;
>
> (E) the individual is advised in writing to consult with an attorney prior to executing the agreement;
>
> (F)(i) the individual is given a period of at least 21 days within which to consider the agreement; or
>
> (ii) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the individual is given a period of at least 45 days within which to consider the agreement;
>
> (G) the agreement provides that for a period of at least 7 days following the execution of such agreement, the individual may revoke the agreement, and the agreement shall not become effective or enforceable until the revocation period has expired;
>
> (H) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the employer (at the commencement of the period specified in subparagraph (F)) informs the individual in writing in a manner calculated to be understood by the average individual eligible to participate, as to -

(i) any class, unit, or group of individuals covered by such program, any eligibility factors for such program, and any time limits applicable to such program; and

(ii) the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program.

29 U.S.C. § 626(f)(1)(A)-(H) (2006). This provision makes clear that an employee may waive his rights under the ADEA, and this principle has been reaffirmed by courts on numerous occasions. See, e.g., Oubre, 522 U.S. at 424; Lloyd v. Brunswick Corp., 180 F.3d 893, 895 (7th Cir. 1999) ("Employees are free to waive their ADEA rights.") (citation omitted).

Plaintiffs fail to offer any argument as to whether the Waiver complies with OWBPA requirements. Instead, Plaintiffs argue that the Waiver is valid only if the City's retirement plan is valid under the ADEA. In essence, Plaintiffs argue that it is impossible for an employee to waive his right to sue for an ADEA violation. Plaintiffs are mistaken. Oubre, 522 U.S. at 424. If Plaintiffs were correct, OWBPA would be meaningless. In fact, the very purpose of OWBPA is to establish the ground rules for employers seeking "releases of certain claims created by [the ADEA]." Id. at 427.

Thus, the Waiver's validity must be assessed without reference to the validity of DROP. If the Waiver is valid, then summary judgment must be granted with respect to all claims except Gaughen's.

1.  <u>Language</u>[6]

The Waiver is a mere three pages of actual text, with a fourth page to be notarized.  Those pages include nine paragraphs, and each paragraph addresses a single topic.  The language used in the Waiver is not complicated.  It is written in plain English and does not use legelese.  Also, just a few lines above where Plaintiffs signed their name, the Waiver states "I have read and I fully understand this Waiver."  Waiver, ¶ 8.  Accordingly, the Court finds that the Waiver is written in language calculated to be understood by the average police officer.

Furthermore, each Plaintiff who was asked during his respective deposition whether he understood the Waiver when he signed it answered in the affirmative.[7]  While not everyone was asked this question, each of the Plaintiffs who was asked said he understood it.  The closest thing to an objection regarding the difficulty of the language used was a statement by Frank Del Rio who wished someone from FOP had "actually come and explain[ed] the DROP plan to [him] in layman's terms, not hand [him] a book."  <u>Id.</u>, Ex. 1, p. 86.  Del Rio's statement, however, expresses a desire to have DROP explained to him, not the Waiver.  Accordingly, based upon the Court's review of the language used in the Waiver, as well as statements by several Plaintiffs that they understood the

---

[6] These sections will track the order of the OWBPA statute.

[7] <u>See</u> DE 51, Ex. 2, p. 57; Ex. 3, p. 40; Ex. 6, p. 67; Ex. 10, p. 55; Ex. 12, p. 32.

Waiver, and the lack of any objections to the difficulty of its language, the Court finds that the Waiver satisfies Section (A) of the OWBPA waiver requirements.

### 2. <u>Reference to the ADEA</u>

The Court notes that Paragraph 1 of the Waiver expressly references not only the ADEA, as required by OWBPA, but also the FCRA. Accordingly, the Court finds that Paragraph 1 of the Waiver satisfies Section (B) of the OWBPA waiver requirements.

### 3. <u>Prospective Claims</u>

A waiver will not satisfy OWBPA if it attempts to waive claims arising after it is signed. Plaintiffs argue that their claims arose after they signed the Waiver because the City maintains a discriminatory policy that constitutes a continuing violation. DE 67, p. 18. The City argues that Plaintiffs' cause of action accrued at the time DROP was enacted, which was prior to the signing of any Waiver.

In support of their position, Plaintiffs cite <u>Snair v. City of Clearwater</u>, 787 F. Supp 1401 (M.D. Fla. 1992) and <u>Delaware State College v. Ricks</u>, 449 U.S. 250 (1980). However, both of these cases address when a statute of limitations begins to run in order to determine the last date that a plaintiff can bring his claims. Neither of these cases address when a cause of action arises for the purpose of an OWBPA waiver agreement.

To answer the question before the Court, it is not proper to focus on the time of the discriminatory action, but the time at

which Plaintiffs "knew or should have known of [their] injury and its cause." White v. Mercury Marine, Div. of Brunswick, Inc., 129 F.3d 1428, 1435 (11th Cir. 1997).  "A claim accrues in a federal cause of action as soon as a potential claimant either is aware, or should be aware, of the existence of and source of an injury." Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1386 (3d Cir. 1994); see also Ricks, 449 U.S. at 258 (holding that the discriminatory action occurred when the unlawful "tenure decision was made and communicated to Ricks") (emphasis added); White, 129 F.3d at 1434 (noting that "the Supreme Court has held that courts should use the discovery rule to determine when a cause of action accrues").

Applying the discovery rule, Plaintiffs' causes of action did not arise after they executed the Waiver.  In fact, certain Plaintiffs' deposition testimony confirmed that they believed they were being discriminated against because of their age when they executed the Waiver.  See, e.g., DE 51, Ex. 1, pp. 86-87; Ex. 11, p. 35.  Not only did they know of the existence of this alleged injury, but they were aware of its source-the DROP program.  Id. Accordingly, the Court finds that the causes of action asserted in the above-styled cause did not arise after execution of the Waiver, and Plaintiffs did not waive claims arising after its execution.

4.  New Consideration

Paragraph 1 of the Waiver states that the same is being signed in exchange for being allowed to participate in and derive the

16

benefits of DROP.  Waiver, ¶ 1.  Additionally, that Paragraph states that the person executing the Waiver "would not otherwise be entitled" to those benefits.  Id.  Plaintiffs have failed to offer evidence tending to show that Plaintiffs were already entitled to DROP benefits prior to executing the Waiver.  Accordingly, the Court finds that Plaintiffs waived their claims in exchange for consideration.

### 5.  Advice to Consult an Attorney

In Paragraph 5 of the Waiver, the signer acknowledges that he was encouraged to consult with an attorney and a professional tax advisor before signing it.  Waiver, ¶ 5.  Plaintiffs have failed to present evidence tending to show that they were not so advised. Accordingly, the Court finds that Plaintiffs were advised in writing to consult with an attorney prior to executing the Waiver.

### 6.  45 Days to Consider

In Paragraph 6 of the Waiver, the signer acknowledges that he was given no less than 45 days to consider the same, and that he was aware that he could use all or any part of that period. Plaintiffs have failed to offer evidence that would contradict this acknowledgment.  Therefore, the Court finds that Plaintiffs were given at least 45 days to consider the Waiver.

### 7.  7 Days to Revoke

In Paragraph 7 of the Waiver, the signer acknowledges that he has been informed that he has 7 days from the date he executes the Waiver in which to revoke it, and that the Waiver does not become

enforceable until those 7 days pass.  Plaintiffs have failed to demonstrate a genuine issue of material facts as to whether they were not aware of or were not afforded the 7-day revocation period. Furthermore, various Plaintiffs agreed that the admonition to seek legal counsel, the 45-day period for reflection, and the 7-day revocation period, were in fact part of the terms of their agreement with the City as reflected in the Waiver, as required by OWBPA.  See, e.g., DE 51, Ex. Nos. 1-3, 5-14.  Thus, the Court finds that the Waiver provided Plaintiffs with at least 7 days following execution to revoke the same, and the Waiver was not enforceable until that period expired.

### 8. Coverage, Terms, and Eligibility of DROP

In addition to being provided with a Waiver upon Plaintiffs' decision to enter DROP, they were each provided with an Information Sheet and Election Form (hereinafter the "Election Form").[8]  The Court finds that the information given in the Election Form satisfies § 626(f)(1)(H).  Because Plaintiffs have failed to provide evidence rebutting that they were properly notified, the Court finds that the Election Form satisfies the terms of Section (H) of the OWBPA waiver requirements.

Based on the forgoing, the Court finds that there exists no genuine issue of material fact regarding the Waiver's satisfaction

---

[8] See DE 51, Ex. 1, Doc. 4; Ex. 2, Doc. 157; Ex. 3, Doc. 91; Ex. 5, Doc. 63; Ex. 6, Doc. 140; Ex. 7, Doc. 75; Ex. 8, Doc. 185; Ex. 9, Doc. 104; Ex. 10, Doc. 123; Ex. 11, Doc. 196; Ex. 12, Doc. 20; Ex. 13, Doc. 36; Ex. 14, Doc. 172.

of the requirements for a waiver of ADEA rights pursuant to §
626(f)(1)(A)-(H). Accordingly, the Court finds that each of the
Plaintiffs, with the exception of James Gaughen, signed Waivers
that satisfy the requirements of OWBPA for a knowing and voluntary
waiver of claims under the ADEA.

   B.  Other Arguments Against Enforcement of the Waiver

   Having found that the Waiver in question passes OWBPA
scrutiny, the Court now turns to Plaintiffs' arguments against the
enforcement of the Waiver. First, Plaintiffs argue that the Waiver
is invalid because such a waiver is only enforceable if the plan it
is attached to passes ADEA scrutiny. Second, Plaintiffs argue that
Waiver has been applied arbitrarily and thus should not constrain
them from pursuing claims otherwise released by the Waiver. Third,
Plaintiffs rebut Defendant's argument that Plaintiffs' claims
should fail because they have failed to tender back the money
received through DROP.

   First, Plaintiffs argue that because the Waiver at issue here
is tied to DROP, a plan Plaintiffs allege discriminates against
them in violation of the ADEA, the Waiver amounts to nothing more
than an illegal contract, and it is void ab initio. Plaintiffs'
argument fails as a matter of law. The promise Plaintiffs seek to
bar enforcement of is their own promise not to bring the very
claims they are now bringing against the City. Plaintiffs
certainly are not seeking to prevent the enforcement of the City's
promise to pay them the hundreds of thousands of dollars they are

collectively owed under DROP.  <u>See</u> DE 66, ¶¶ 17-30. Plaintiffs'
Waiver is not only legal, but also, it is expressly allowed under
OWBPA and has been expressly allowed by numerous courts.  <u>See,</u>
<u>e.g.,</u> <u>Oubre v. Entergy Operations, Inc.</u>, 522 U.S. 422 (1998);
<u>Lloyd v. Brunswick Corp.</u>, 180 F.3d 893, 895 (7th Cir. 1999).

Plaintiffs' argument that the Waiver must be found invalid if
DROP violates the ADEA defies logic.  If DROP had to pass ADEA
scrutiny in order for the Waiver to be valid, it is difficult to
imagine the utility of such a waiver.  Furthermore, Plaintiffs
would have provided no consideration to the City in return for the
benefits of entering DROP, but rather, they would have simply
waived their right to bring frivolous claims.  The Court therefore
finds that the issue of DROP's lawfulness under the ADEA has no
bearing on the enforceability of the Waiver signed by Plaintiffs.

Second, Plaintiffs argue that the City has inconsistently
enforced the Waiver and only seeks to assert it against officers
bringing claims of age discrimination.  This argument arises from
two different factual scenarios.  First, an officer named Alan
Stone entered DROP in 2000, and was not required to execute a
Waiver at that time.  <u>See</u> DE 60, Ex. E.[9]  Second, Plaintiffs point

---

[9] Plaintiffs also point to the deposition testimony of
Detective Mangifesta who stated that other officers signed up for
DROP without executing a waiver.  <u>See</u> DE 60, Ex. A, p 26.
Mangifesta further stated that he could not give the names of these
officers, and could not recall who they were.  As noted above,
however, "mere allegations" such as these, without further
documentation establishing specific facts, do not create a genuine
issue for trial.  <u>L.S.T., Inc. v. Crow</u>, 49 F.3d 679, 684 (11th Cir.
1995).

to the officers who had already enrolled in DROP at the time of the 2000 Agreement but received the benefits of the extended DROP period and extended multiplier.  According to Plaintiffs, this shows inconsistency in enforcement because the aforementioned officers received those benefits despite having signed the Waiver, and entered DROP, which normally freezes one's benefits because the officer is considered retired.[10]

The Court begins by noting that the facts set forth in favor of this argument are not disputed.  More important, however, is the fact that Plaintiffs do not articulate any legal theory under which these facts would render the Waiver unenforceable against them.  It appears that Plaintiffs are arguing that having not enforced the Waiver against other parties, the City should be estopped from enforcing it against them.  The Court notes that "[e]quitable estoppel precludes a person from maintaining a position inconsistent with another position . . . which was asserted at a previous time."  Bailey v. State Farm Mut. Auto. Ins. Co., 789 So. 2d 1181, 1183 (Fla. Dist. Ct. App. 2001).

However, it is axiomatic that for an argument of equitable

_____

[10] It is worth noting that according to Detective Mangifesta, the City originally did not want to extend additional benefits to these officers for the very reasons set forth by Plaintiffs above. DE 60, Ex. A, p. 17.  The City apparently changed its mind during negotiations, however, when FOP argued that "as long as somebody was putting on a gun belt and going out and putting your life on the line every day, they were not retired, they were still working."  Id.

estoppel to be successful, the inconsistent conduct must have caused prejudice to someone who acted in reliance on the prior conduct. Id. Plaintiffs have presented no evidence that would establish that they signed the Waiver expecting it not to be enforced against them, or that those who entered DROP prior to the 2000 Agreement received extra benefits as a result thereof. Further, the mere fact that Alan Stone never signed a Waiver has no bearing on whether a person who signed the Waiver would be bound by it. Accordingly, drawing all possible inferences from the above facts in favor of Plaintiffs, there is no legal theory under which these facts result in non-enforcement of the Waiver.

Even if it is later determined that the an estoppel theory is applicable in the above-styled cause, the Court finds that the record does not support a finding that the Waiver has been inconsistently enforced by the City. Regarding Alan Stone, Plaintiffs support their argument by presenting an Affidavit wherein Stone states that he has entered DROP, and that he has not signed a Waiver. DE 60, Ex. E. Stone does not say why he did not sign a Waiver, and no explanation appears elsewhere in the record. The City responded by filing the Affidavit of John Panoch, Personnel Director of the City of Fort Lauderdale. DE 65, Ex. A. Panoch states that "[i]n the course of discovery in this case, it came to my attention that Al Stone . . . failed to provide me with the mandatory executed waiver of rights form at the time he was admitted into the DROP plan." See DE 65, Ex. A, pp. 2-3. Further,

the City made no exception for Stone from this requirement of every officer entering DROP. Panoch also stated that the failure to collect Stone's Waiver was due to inadvertence, and that steps were being taken to remedy the oversight. Id. Because this is the only explanation in the record as to why Stone did not sign a Waiver, the Court finds that there is no support for the proposition that the City was inconsistently enforcing the Waiver.

Additionally, the extension of benefits to those in DROP at the time of the 2000 Agreement does not implicate the Waiver at all. Those officers who signed a Waiver before the 2000 Agreement did not sue or threaten to sue for increased benefits. Rather, they received the additional benefits as a result of negotiations between the City and FOP. Thus, there are no facts sufficient to create a genuine issue regarding any inconsistent application of the Waiver by the City.

Finally, Plaintiffs argue that their execution of the Waiver was not voluntary because they had to execute the document to enter DROP, and DROP was too economically advantageous to pass up.[11] Notwithstanding comments like these, during their depositions, Plaintiffs conceded that they were not forced to sign the Waiver

_____

[11] See, e.g., DE 51, Ex. 1, pp. 84-85 ("[E]ither I signed it or I wouldn't be able to go into the DROP plan, so I had to sign it; or if I waited I . . . wouldn't have gotten on the DROP plan at all, so I had to sign it."); Ex. 14, p. 39 ("Was there a gun held to my head? It depends. I mean, a gun is more than something that just shoots a bullet. Were there financial considerations I had to make? Yes. So was there a gun to my head? So to speak.").

under threat of physical, economic, or professional repercussions.

The Court finds that the City did not infringe upon the voluntariness of Plaintiffs' waiver by extending to them an economic benefit they considered too good to pass up. Indeed, "[a] person contemplating an offer of early retirement may find the choice hard because *both* options–continued employment and early retirement–are desirable. The high value of each option hardly calls the voluntariness of the choice into question, however." Henn v. Nat'l Geographic Soc., 819 F.2d 824, 829 (7th Cir. 1987). The fact that Plaintiffs felt "forced" to sign the Waiver and enter DROP simply speaks to the quality of the benefit extended by the City. If the officers did not feel compelled to enter DROP, the City would not have done a good job on the "incentive" portion of its early retirement incentive program. See Abrahamson v. Bd. of Educ. of Wappingers Falls Cent. Sch. Dist., 374 F.3d 66, 74 (2d Cir. 2004) ("[A]n early retirement plan must, at a minimum, provide some incentive to retire. In other words, the plan must make retirement a relatively more attractive option than continuing to work.")

In making this finding, the Court is not weighing the facts regarding Plaintiffs' voluntariness, and finding for the City. Rather, the Court finds that while Plaintiffs spoke of non-voluntariness, when questioned at their depositions they admitted that they freely entered DROP, and freely signed the attendant

24

Waiver.  See, e.g., DE 51, Ex. 1, pp. 84-85; Ex. 11, pp. 33-37. While Plaintiffs employed language indicating involuntariness to describe the difficult choice between retiring under normal retirement, or availing themselves of the new benefits afforded by DROP, a choice is not rendered non-voluntary by the fact that it is difficult.  Henn, 819 F.2d at 829.  Further, a choice is not rendered non-voluntary simply because it was, as in this case, too good to refuse.  Accordingly, the Court finds that Plaintiffs' statements to the effect that they felt forced to sign the Waiver do not create a genuine issue of material fact as to the voluntariness of those Waivers.

In sum, the Court finds that each of the Plaintiffs, with the exception of James Gaughen, executed a Waiver of the claims they now attempt to assert against the City.  The Court further finds that the Waiver satisfies the standard for knowing and voluntary as set forth in OWBPA.  Finally, the Court finds that Plaintiffs' additional arguments are without merit in that they do not raise a genuine issue of material fact as to the legitimacy of the Waiver, or as to whether the aforementioned Plaintiffs knowingly and voluntarily executed the same.  Accordingly, the Court finds that the City is entitled to judgment as a matter of law regarding the claims alleged by each of the Plaintiffs with the exception of Gaughen.  Because Gaughen's claims remain, and in the event that any reviewing court finds that Plaintiffs have not waived their claims against the City, the Court will now consider the lawfulness

of DROP.

### C.   Lawfulness of DROP

The ADEA makes it unlawful to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1) (2006). The FCRA, in turn, states that it is unlawful to "discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's . . . age."  Fla. Stat. § 760.10 (2008).  The analysis the Court employs regarding a claim of age discrimination is the same under the ADEA and the FCRA.  Zaben v. Air Products & Chemicals, Inc., 129 F.3d 1453, 1455 (11th Cir. 1997); Morrow v. Duval County Sch. Bd., 514 So. 2d 1086 (Fla. 1987).

While this prohibition is set forth in a straight forward manner, "[t]he question of the proper treatment of early-retirement programs is the most difficult question under the Age Discrimination in Employment Act." Karlen v. City of Colleges, 837 F.2d 314, 317 (7th Cir. 1988).  This is so because the discussions leading up to the implementation of such a program necessarily involve questions of age and the benefits to be gained by an employer if certain employees retire, but the resultant "discrimination seems to be in favor of rather than against older employees, by giving them an additional option and one prized by many older employees." Id.  Difficulty in applying this area of

the law has been increased over the years by an exchange between Congress and the Supreme Court that saw numerous modifications in the analysis used to test the lawfulness of retirement incentive plans.  See Auerbach v. Bd. of Educ. of the Harborfields Cent. Sch. Dist. of Greenlawn, 136 F.3d 104, 110-12 (2d Cir. 1998) (discussing the back and forth between Congress and the Supreme Court).  This exchange culminated with the enactment of OWBPA, which amended various provisions of the ADEA.

To establish a prima facie case, a "'plaintiff must produce sufficient evidence to support an inference that the defendant employer based its employment decision on an illegal criterion.'" Alphin v. Sears, Roebuck & Co., 940 F.2d 1497, 1500 (11th Cir. 1991) (quoting Halsell v. Kimberly-Clark Corp., 683 F.2d 285, 290 (8th Cir. 1983)).  This is achieved "through one of three generally accepted methods: by direct evidence of discriminatory intent; by meeting the four-pronged test set out for Title VII cases in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); or through statistical proof."  Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989).  The Court will address these three avenues in turn.

First, Plaintiffs have failed to produce direct evidence of discriminatory intent.  Plaintiffs have offered evidence in the form of statements suggesting DROP was established to encourage older, higher paid officers to retire.  See, e.g., DE 60, Ex. B, pp. 9-10.  Plaintiffs also emphasize the deposition testimony of

27

James Gaughen in which he said that Jack Lokeinsky, FLPD Detective, said "the City wants to get rid of you old farts."  DE 51, Ex. 4, p. 59.  However, Mr. Gaughen was neither able to testify whether that comment indeed was made by an authorized agent of the City, nor who made the comment.  The Court will disregard this comment because it constitutes double hearsay, and the initiating source of the comment is unknown.  Second, Plaintiffs claims do not necessitate <u>McDonnell Douglas</u> review because Plaintiffs do not allege any indirect evidence of discrimination.

Third, Plaintiffs have failed to establish a prima facie case based on disparate impact because they have not offered statistical evidence in support.  To establish a prima facie case of disparate impact, a plaintiff must show,

> 1) there is a significant statistical disparity among members of different [age] groups; 2) there is a specific, facially-neutral employment policy or practice; and 3) there is a causal nexus between the specific policy or practice and the statistical disparity.

<u>See</u> <u>Cooper v. S. Co.</u>, 390 F.3d 695, 724 (11th Cir. 2004), <u>overruled on other grounds</u>, <u>Ash v. Tyson Foods, Inc.</u>, 546 U.S. 454, 457 (2006).  The only evidence offered by Plaintiffs is the following example:

> if a police officer turns 40 at his 20 year anniversary with the department, by the time he is eligible for the DROP plan, at age 45, he will have accrued a maximum pension retirement percentage of 81% (3.38% X 24 years) of their salary and he will also be able to reap the benefit of a full 60 month DROP plan.  However, in the case of an officer who is 45 or older at his 20 year anniversary, he would be faced with the dilemma of

> entering the DROP plan with a pension retirement
> percentage of 67.5% of his salary and retiring in 5
> years, or he could bypass the DROP altogether and
> continue to work for 4 more years where he could then max
> out his retirement at 81% at age 49, but only have 12
> months of DROP and retirement in one year.

DE 180, p. 13.  This example oversimplifies the facts of this case.

Seven of the fourteen Plaintiffs in this case receive a pension

greater than 81% in addition to their DROP benefits: David Ecklund

(90.4%), Timothy Falk (83.3%), James Gaughen (91.26%), Stephen

Medley (84.3%), David Nickerson (85.1%), Sam Wernick (91.26%), and

Jim Wigand (90.4%).

Thus, the example does not cover the group of persons joined

in this action.  In fact, if Plaintiffs had performed a detailed

statistical analysis of the retirement benefits older workers

received in comparison to younger workers, it may yield the result

that older workers received even more lucrative retirement packages

than younger workers could hope to attain.  However, no such

statistical analysis has been provided to the Court.  Thus,

Plaintiffs have failed to establish a prima facie case of disparate

impact.

However, for the benefit of the Parties and any reviewing

court, the Court will assume a prima facie case has been

established and address the City's affirmative defense.  The City

argues that its DROP program fits within the safe harbor provision

of the ADEA.  When considering an early retirement incentive

program like DROP, the Court notes that OWBPA provides the

following:

It shall not be unlawful for an employer, employment agency, or labor organization- . . .

(2) to take any action otherwise prohibited under subsection (a), (b), (c), or (e) of this section- . . .

(B) to observe the terms of a bona fide employee benefit plan-

(i) where for each benefit or benefit package, the actual amount of payment made or cost incurred on behalf of an older worker is no less than that made or incurred on behalf of a younger worker, . . . ; or

(ii) that is a voluntary early retirement incentive plan consistent with the relevant purpose or purposes of this chapter.

29 U.S.C. § 623(f)(2)(B)(i)-(ii) (2006).

Plaintiffs are challenging the age component of DROP, an early retirement incentive program, thus the safe harbor found in § 623(f)(2)(B)(ii) (hereinafter the "safe harbor") guides the Court's analysis.   The safe harbor "does not require that an employer provide identical early retirement incentives for employees of different ages or incur the same costs for all employees.   Rather, the early retirement incentive plan need only be voluntary and consistent with the ADEA's relevant purpose(s)."   Auerbach, 136 F.3d at 112.

The Court finds the City's DROP program is both voluntary and consistent with the ADEA's purpose.   First, the program is completely voluntary.   Although Plaintiffs argue their decision was not voluntary, the Court finds otherwise.   No one improperly

threatened, coerced, or pressured Plaintiffs to register for the DROP program. Instead, Plaintiffs' own statements make clear that they enrolled in the program because it was too good to refuse. Thus, all Plaintiffs, with the exception of Mr. Gaughen, voluntarily signed up for DROP.

Second, the City's DROP program fits within the purpose of the ADEA. Of crucial importance is the fact that the DROP program is a carrot, not a stick. This case is not one in which older workers are being fired or otherwise forced out without a say in the matter. Instead, this is one in which a municipality created an incentive for officers to voluntarily enter a program that offered increased retirement benefits for those who chose to retire early. Plaintiffs argue that the 2000 Agreement resulted in older workers receiving less benefits under DROP than younger workers. However, the undisputed facts demonstrate otherwise. While the 2000 Agreement provided for a maximum accrual rate of 81%, several of Plaintiffs were allowed to exceed the maximum accrual rate. Supra, pp. 4, 29 (David Ecklund (90.4%), Timothy Falk (83.3%), James Gaughen (91.26%), Stephen Medley (84.3%), David Nickerson (85.1%), Sam Wernick (91.26%), and Jim Wigand (90.4%)). Thus, older workers, in some cases, were treated more favorably than younger workers.

The Court does acknowledge that some Plaintiffs received less lucrative retirement benefits than others. The basis for this discrepancy, however, is not the age of Plaintiffs; rather, it

results from their pension status, a complex framework created as a result of the ongoing negotiations between the City and the FOP that determines the benefits an officer receives.  Although age is one factor that weighs in to an officer's pension status, it is not an impermissible component.  Hazen Paper Co. v. Biggins, 507 U.S. 604, 613 (1993).  The Supreme Court has recently reaffirmed its prior holding that discrimination on the basis of pension status is not unlawful under the ADEA, so long as it is not a "proxy for age."  Ky. Ret. Sys. v. EEOC, ___ U.S. ___, 128 S.Ct. 2361, 2366-67 (2008) (noting that a complex set of rules determined benefits, rather than individual employment decisions) (quoting Hazen Paper Co., 507 U.S. at 613).  In other words, age can be considered in the framework of an employees' benefits, but it should not be the basis of individual employment  decisions that negatively affect certain employees.  Further, the rules embedded in pension systems are treated "more flexibly and leniently in respect to age" by the ADEA.  Id. at 2367.

The discrepancy in pension accrual rates between Plaintiffs and others is based on their respective pension status, not their age alone.  The benefits each individual Plaintiff receives is a result of a complex set of factors negotiated between the City and FOP, in which age is one factor.  DE 51, Ex. 16, ¶ 11.  The benefits are not determined by individual employment decisions based on age.  For instance, Mr. Lerman did not enter DROP when he initially became eligible, and thus, he lost the ability to accrue

the full spectrum of DROP benefits that would have been afforded to him.  He and others, for various reasons, chose not to enroll in DROP upon initial eligibility and lost some of the benefits of earlier enrolment.  Thus, the reduction in benefits resulting from Plaintiffs' decision not to enrol in DROP at their earliest point of eligibility is attributable solely to their own decision, and it is part of the complex framework that determines the benefits they are entitled to.  Therefore, the Court finds the City's DROP program falls within the safe harbor provision of the ADEA because it is voluntary and in accord with the purposes of the ADEA. Further, any disparity between Plaintiffs and others is attributable to their pension status, not their age.  Hazen Paper Co., 507 U.S. at 613; Price Waterhouse v. Hopkins, 490 U.S. 228 (1989).

## IV. Conclusion

The Court finds that thirteen of the fourteen Plaintiffs to the above-styled cause released the City from liability it may otherwise have had for these claims.  Alternatively, the Court finds that DROP is non-discriminatory as to all Plaintiffs.  Thus, the Court does not reach Defendant's other arguments in support of the instant Motion.

Accordingly, after due consideration, it is

**ORDERED AND ADJUDGED** as follows:

1. That Defendant City of Fort Lauderdale's Motion For Summary Judgment (DE 173) be and the same is hereby **GRANTED;** and

    2.  Plaintiffs' Renewed Cross Motion For Partial Summary Judgment As To Liability (DE 181) be and the same is hereby **DENIED**; and

    3.  Pursuant to Rules 56 and 58, Final Judgment shall be entered by separate Order.

    **DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this ___23rd___ day of December, 2008.


                          _____
                          WILLIAM J. ZLOCH
                          United States District Judge

Copies furnished:

All Counsel of Record